IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

MARK E. GESSNER,                           :

       Plaintiff,

                       Case No. 3:16-cv-234

      v.                              :

                       JUDGE WALTER H. RICE

MICHAEL S. SAYLORS, *et al.*,

       Defendants.                 :

---

DECISION AND ENTRY SUSTAINING DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT (DOC. #37); JUDGMENT TO ENTER IN
FAVOR OF DEFENDANTS AND AGAINST PLAINTIFF; TERMINATION
ENTRY

---

Following his arrest, *pro se* Plaintiff, Mark E. Gessner, filed suit against City

of Dayton Police Officers Michael S. Saylors and Randy J. Beane.  He seeks relief

under 42 U.S.C. § 1983, alleging that the officers, acting under color of state law,

violated his constitutional rights by arresting him without probable cause, and by

using excessive force during the course of his arrest.  Gessner also asserts state

law claims of intentional and negligent infliction of emotional distress.

This matter is currently before the Court on Defendants' Motion for Summary Judgment, Doc. #37.[1] For the reasons set forth below, the Court sustains that motion in its entirety.

## I.    Background and Procedural History

The material facts of this case are largely undisputed, as indicated by the Verified Amended Complaint, Doc. #19, and the affidavits submitted in support of the Motion for Summary Judgment, Doc. #37, and the Memorandum in Opposition thereto, Doc. #41.

On the evening of March 30, 2013, Dayton Police Officers Michael Saylors and Randy Beane were dispatched to 417 Bantz Court on a call of breaking and entering. The caller, Kevin Whitenack, told the dispatcher that two white men had just removed a furnace from a vacant house located at that address. Doc. #37-1, PageID##169-70; Doc. #37-2, PageID#173. One of the men was allegedly wearing a black jacket. The caller did not know what the second man was wearing. Doc. #41-2, PageID#203; Doc. #41-3, PageID#210.

En route, Officer Saylors spoke on the phone to Kevin's wife, Karen Whitenack, who said that these two men had frequently been stealing from this vacant house. He also spoke to Kevin, who stated that, from his front porch, he had watched the men carry what he believed to be a furnace out of the vacant

---

[1]    The Court denies Gessner's request for oral argument on Defendants' motion. In the Court's view, oral argument is not essential to the fair resolution of this matter. *See* S.D. Ohio Civ. R. 7.1(b)(2).

2

house, down the sidewalk, and into the side yard of 429 Bantz Court.  According to Kevin, the two men were currently inside the house at 429 Bantz Court.  Doc. #37-1, PageID#170.

Officer Beane went over to inspect the vacant house at 417 Bantz Court.  It was boarded up, but the side door had been kicked in, and copper piping, the furnace and other appliances appeared to have been removed from the property.  Doc. #37-2, PageID##173-74.  Beane then tried to get a better description of the suspects from Kevin Whitenack.  Doc. 41-2, PageID#203.

Thereafter, Saylors and Beane knocked on the door of 429 Bantz Court.  Amy Leopard lived there with her boyfriend, Christopher Miller, her father, John Leopard, and her daughter.  She let the officers in.  Two white men, later identified as Mark Gessner and Christopher Miller, were sitting in the living room, drinking beer.  Officer Beane stated that Gessner and Miller matched the description of the suspects.  The officers asked the men to stand and place their hands behind their backs to be escorted to the police cruiser for further investigation.  Officer Saylors explained that he wanted to give Mr. Whitenack the opportunity to positively identify the men.  Doc. #37-1, PageID##170-71; Doc. #37-2, PageID#174.

Saylors noted that Gessner's speech was slurred.  Gessner, who admits that he was drinking beer, ignored three separate orders to stand and place his hands behind his back; he finally complied with the fourth request.  Doc. #37-1, PageID#170; Doc. #37-2, PageID#174; Doc. #41-2, PageID#198.  Gessner maintains that the commands were given in quick succession, and that any brief

3

delay in compliance was due to the fact that he was totally bewildered as to why he was being arrested.  Doc. #41-2, PageID#198.

As Saylors was escorting Gessner to the cruiser, Saylors coughed loudly to get Mr. Whitenack's attention and pointed at Gessner.  Whitenack, who was still standing on his front porch, nodded his head, indicating that Gessner was one of the individuals he had seen removing the furnace from the vacant house.  Doc. #37-1, PageID##170-71.

As he was being escorted to the police cruiser, Gessner turned to face Officer Saylors to inform him that he had done nothing wrong and knew his rights.  Saylors placed a hand on Gessner's shoulder and turned him back around.  Doc. #41-2, PageID#199.  Gessner turned toward him a second time and said, "I'm not going anywhere!"  According to Saylors, Gessner then reared his head back as if he were going to head butt him.  Gessner has not denied this.  Saylors performed a take-down maneuver, forcing Gessner to his knees onto the concrete sidewalk, and taking him to the ground.  He then pulled Gessner to his feet and continued to escort him to the cruiser.  Doc. #37-1, PageID#171; Doc. #37-2, PageID#174; Doc. #37-3, PageID#177; Doc. #41-2, PageID#199.

Meanwhile, Officer Beane escorted Christopher Miller to the cruiser without incident.  Miller had two small LED flashlights in the pocket of his pants.  Doc. #37-1, PageID#170; Doc. #37-2, PageID#174.  After Gessner and Miller were secured in the cruiser, the officers returned to Kevin Whitenack's porch and asked

4

him if these were the individuals he had observed breaking into the vacant house. He confirmed that they were. Doc. #37-1, PageID#171.

Because Gessner complained that he was injured during the takedown maneuver, Officer Saylors called Sergeant Eric Sheldon to the scene. Gessner told Sheldon that Saylors had pulled him out of the house for no reason. He complained that his knee was injured when Saylors slammed him to the ground, and that his wrists hurt because the handcuffs were too tight. Sheldon noticed a small abrasion on Gessner's right knee and took a photograph of it. He observed no injury to Gessner's wrists, and noted that he could easily fit his finger between Gessner's wrist and the handcuffs. Gessner complained of no other injuries. Doc. #37-3, PageID##177-78. Gessner and Miller were taken to the Montgomery County Jail, where they were questioned and later released with no charges filed against them.

Gessner initially filed suit on March 30, 2015, Case No. 3:15-cv-112, but dismissed the case without prejudice to refiling. On June 13, 2016, Gessner again filed suit against Officers Saylors and Beane, in their official and individual capacities. He alleges that the officers, acting under color of state law, violated his Fourth Amendment rights by arresting him without probable cause, and by using excessive force during the course of the arrest. He also asserts claims of intentional and negligent infliction of emotional distress.

Gessner maintains that the officers targeted him in retaliation for previous suits he has filed against Dayton police officers. He also alleges that, as a result of

5

the force that was used against him on the night of his arrest, he required shoulder

surgery and several months of physical therapy. In addition, he alleges that he

suffers from Post-Traumatic Stress Disorder as a result of this incident. Gessner

seeks compensatory and punitive damages, as well as declaratory judgment. Doc.

#19.

Defendants have moved for summary judgment on all claims. Doc. #37.

That motion is now fully briefed and ripe for decision.


## II.    Summary Judgment Standard

Summary judgment must be entered "against a party who fails to make a

showing sufficient to establish the existence of an element essential to that party's

case, and on which that party will bear the burden of proof at trial." *Celotex Corp.

v. Catrett*, 477 U.S. 317, 322 (1986). The moving party always bears the initial

responsibility of informing the court of the basis for its motion, and identifying

those portions of the record which it believes demonstrate the absence of a

genuine issue of material fact. *Id.* at 323; *see also Boretti v. Wiscomb*, 930 F.2d

1150, 1156 (6th Cir. 1991).

"Once the moving party has met its initial burden, the nonmoving party must

present evidence that creates a genuine issue of material fact making it necessary

to resolve the difference at trial." *Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241,

1245 (6th Cir. 1995); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

250 (1986). Once the burden of production has so shifted, the party opposing

6

summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324. "The Plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the Plaintiff." *Michigan Prot. & Advocacy Serv., Inc. v. Babin*, 18 F.3d 337, 341 (6th Cir. 1994).

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In determining whether a genuine dispute of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in favor of that party. *Id.* at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe. Credibility determinations must be left to the fact-finder. 10A Wright, Miller & Kane, *Federal Practice and Procedure* Civil 3d § 2726 (1998).

III.    Analysis

A.    42 U.S.C. § 1983 Claims (Counts I and II)

Gessner seeks damages under 42 U.S.C. § 1983. Section 1983 "'is not itself a source of substantive rights,' but merely 'a method for vindicating federal rights elsewhere conferred.'" *Graham v. Conner*, 490 U.S. 386, 393-94 (1989) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). In order to recover under § 1983, a plaintiff must prove that a defendant, while acting under color of state law, violated rights secured by the Constitution or laws of the United States. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150 (1970).

In this case, there is no question that Officers Saylors and Beane were acting under color of state law at the time of the events in question. At issue is whether they violated his constitutional rights. Gessner has alleged that they violated his Fourth Amendment rights, as made applicable to the states by the Fourteenth Amendment, by using excessive force against him (Count I), and by arresting him without probable cause (Count II).

1.    Official Capacity Claims

Before turning to the merits of Gessner's § 1983 claims, the Court notes that Gessner has sued Officers Saylors and Beane individually and in their official capacities as employees of the City of Dayton. As the Supreme Court explained in *Kentucky v. Graham*, 473 U.S. 159 (1985), an individual-capacity suit seeks to impose *personal* liability on a government official for actions taken under color of

state law. An official-capacity suit, however, is the equivalent of an action against the governmental entity of which the officer is an agent. *Id.* at 165.

A municipality cannot be held liable based solely on the unconstitutional conduct of its employees. Rather, a plaintiff must prove that a custom or policy of the municipality was the moving force behind the constitutional violation. *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694 (1978). A plaintiff may prove the existence of a custom or policy in several ways, including: "(1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations." *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005).

Gessner's Amended Complaint is completely devoid of any allegations that would support a finding that a custom or policy of the City of Dayton or its Police Department was the moving force behind the alleged constitutional violations. Likewise, nothing in the exhibits attached to Gessner's Memorandum in Opposition to the Motion for Summary Judgment supports a theory of municipal liability. Accordingly, to the extent that Saylors and Beane have been sued in their *official* capacities, they are entitled to summary judgment in their favor.

### 2. Individual Capacity Claims

With respect to the § 1983 claims asserted against them in their individual capacities, Defendants argue that, based on the evidence presented, no reasonable jury could find that they violated Gessner's constitutional rights. They also argue

that they are entitled to qualified immunity on these claims. The doctrine of qualified immunity shields government officials from liability for civil damages for actions taken in the scope of their duties unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

"Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions" and, "[w]hen properly applied, protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). After a defendant raises a claim of qualified immunity, the plaintiff bears the burden of rebutting it. *Ciminillo v. Streicher*, 434 F.3d 461, 466 (6th Cir. 2006).

To determine whether Officers Saylors and Beane are entitled to qualified immunity, the Court must consider: (1) whether "a constitutional right would have been violated on the facts alleged"; and (2) whether the constitutional right at issue was "clearly established." *Saucier v. Katz*, 533 U.S. 194, 201 (2001).[2]

---

[2] "[A] defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014). The court looks "first to decisions of the Supreme Court," then to Sixth Circuit cases and "decisions of other courts within the circuit, and then to decisions of other Courts of Appeal." *Andrews v. Hickman Cty.*, 700 F.3d 845, 853 (6th Cir. 2012). Although the conduct at issue in those cases need not be identical, legal precedent must compel the conclusion that the conduct is unlawful. *Hensley v. Gassman*, 693 F.3d 681, 687 (6th Cir. 2012). *See also al-Kidd*, 563 U.S. at 741 ("We do not require a case directly on point, but

These questions need not be considered in order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). If the answer to *either* inquiry is "no," the officers are entitled to qualified immunity.

The Court must conduct this qualified immunity analysis with respect to each of the § 1983 claims asserted against the officers. In doing so, it must view the evidence in the light most favorable to Gessner, the non-moving party, and draw all reasonable inferences in his favor. The Court cannot resolve genuine issues of material fact in favor of Defendants. *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014).

Defendants maintain that, based on the facts alleged, no reasonable jury could find that Gessner's constitutional rights were violated. For the reasons set forth below, the Court agrees.

### a. Count I: Use of Excessive Force

The Amended Complaint alleges that Defendants, acting under color of state law, used excessive force against him during the course of his arrest in violation of his right under the Fourth Amendment to the United States Constitution to be free from unreasonable seizures. Gessner maintains that, because he was compliant, there was no need for Defendants to physically force him to the concrete sidewalk. He alleges that the takedown maneuver caused a substantial shoulder injury that required surgery and several months of physical therapy, and will require ongoing

---

existing precedent must have placed the statutory or constitutional question beyond debate.").

11

medical treatment. He further alleges that he suffers from Post-Traumatic Stress Disorder as a result of this incident. Doc. #19, PageID##109, 111.

Although both Defendants are named in Count I of the Amended Complaint, it is undisputed that Officer Beane did not use any force against Gessner. Rather, it was Officer Saylors who escorted Gessner from the house and performed the takedown maneuver at issue. *Id.* at PageID##106-07.

Gessner does not suggest that Officer Beane is somehow liable for failing to intervene in Saylors' use of force. Although "there are circumstances under which police officers can be held liable for failure to protect a person from the use of excessive force," this is not one of them. An officer cannot be held liable for failure to intervene unless he has "reason to know that excessive force would be or was being used," and had "the opportunity and the means to prevent the harm from occurring." *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997). In this case, Officer Beane cannot be held liable on this theory, given that the events in question unfolded in just a few seconds and, at the time, Beane was busy escorting Christopher Miller to the cruiser. Gessner impliedly concedes this point by failing to respond to this argument. Under the circumstances presented here, the Court finds that Officer Beane is entitled to summary judgment on Gessner's claim of excessive force.

The Court now turns to the claim asserted against Officer Saylors. Saylors argues that, viewing the undisputed facts in the light most favorable to Gessner, the force that he used against Gessner cannot be deemed unconstitutional. The

Court agrees. In the first step of the qualified immunity analysis, the Court must

determine whether the

> evidence produced by plaintiff, taken in the light most favorable to
> plaintiff but viewed from the perspective of a reasonable officer on
> the scene, establishes a claim of excessive force in violation of the
> Constitution. The force must be objectively unreasonable such that it
> could not have been based on a reasonable mistake of law.

*Grawey v. Drury*, 567 F.3d 302, 309 (6th Cir. 2009).

The Supreme Court has held that police officers are entitled to use "some

degree of physical coercion" to effect an arrest, and "[n]ot every push or shove,

even if it may later seem unnecessary in the peace of a judge's chambers[,]

violates the Fourth Amendment." *Graham v. Connor*, 490 U.S. 386, 396 (1989)

(internal quotation omitted). In *Graham*, the Supreme Court explained that, in

analyzing a claim of excessive force, the relevant question is "whether the officers'

actions are 'objectively reasonable' in light of the facts and circumstances

confronting them, without regard to their underlying intent or motivation." *Id.* at

397.[3] Objective reasonableness depends on the totality of the circumstances.

Factors to be considered include "the severity of the crime at issue, whether the

suspect poses an immediate threat to the safety of the officers or others, and

whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*

at 396.

_____

[3]  The Amended Complaint alleges that Defendants "purposely targeted Mark
Gessner for reasons of retaliation in relation to his past and ongoing civil litigation
against police officers employed by the City of Dayton Police Department." Doc.
#19, PageID#109. However, evil intentions play no part in determining whether
the officers' actions were objectively reasonable. *Graham*, 490 U.S. at 397.

13

In this case, the material facts are largely undisputed. Gessner was suspected of breaking and entering, a fifth degree felony under Ohio Revised Code §2911.13. Moreover, according to Karen Whitenack, this was not the first time that Gessner and Miller had stolen items from the vacant house. Doc. #37-1, PageID#169. Gessner admits that he had been drinking beer, and that he failed to comply with Saylors' first three orders to put his hands behind his back. According to Gessner, these commands came in quick succession and "[a]ny split second delay in complying with the order . . . was due to the total bewilderment I was experiencing." He maintains that he had no idea why he was being arrested, and that Officer Saylors failed to respond to his inquiries. Doc. #41-2, PageID#198.

Gessner also admits that, while being escorted to the cruiser, he twice turned to face Officer Saylors. The first time, he insisted that he had done nothing wrong; he also told Saylors that he knew his rights. *Id.* at PageID#199. In response, Saylors placed his hand on Gessner's shoulder and turned him back around. *Id.*

According to Saylors, Gessner then turned around a second time, more aggressively, and said, "I'm not going anywhere!" Doc. #37-1, PageID#171. Beane maintains that Gessner said this loudly. Doc. #37-2, PageID#174. Gessner admits making the statement, but objects to Saylors' characterization. Gessner claims that he said this only to inform Officer Saylors that there would be no need for any use of force (presumably because he was planning to be cooperative).

14

Doc. #41-2, PageID#199. Christopher Miller agrees that this appears to have been the purpose of Gessner's statement. Doc. #41-1, PageID#195.[4]

Saylors, however, averred that, at the same time that Gessner said, "I'm not going anywhere!", Gessner reared his head back. Gessner has not denied doing this. Saylors, concerned that Gessner was about to head butt him, forced Gessner to his knees on the concrete sidewalk and then forced him to the ground. Doc. #37-1, PageID#171. According to Gessner, Saylors then grabbed his right wrist and pulled upward, forcing Gessner's face to within two inches of the sidewalk. Doc. #41-2, PageID#199. Saylors then told Gessner to get up and go to the cruiser, and Gessner complied. *Id. See also* Doc. #41-1, PageID##194-95.

The Court finds that there are no material facts in dispute that would defeat Saylors' claim of qualified immunity. Viewing the evidence in the light most favorable to Gessner, a reasonable officer on the scene could have believed that the amount of force used was objectively reasonable. Again, the Court looks to the *Graham* factors to determine whether a constitutional violation occurred. Gessner was suspected of committing a felony, he had been drinking, and admittedly failed to comply with orders to put his hands behind his back. He was insistent that he had done nothing wrong.

_____

[4]   Both parties refer to an audio recording of the incident, and Gessner refers to an audio recording of Whitenack's call to the police; however, no such recordings have been filed with the Court. Because these recordings are not in the record, they cannot be considered in ruling on the motion for summary judgment. *See* Fed. R. Civ. P. 56(1).

The Court need not resolve the question of whether Gessner's statement, "I'm not going anywhere!" was (as Gessner suggests) a promise of cooperation, rendering any use of force unnecessary, or (as Saylors suggests) a statement of defiance. This is because it is undisputed that, at the same time that Gessner made the statement, he reared his head back as if he were going to head butt Officer Saylors. Under these circumstances, despite the injuries that it allegedly caused, the takedown maneuver cannot be deemed objectively unreasonable.[5]

A reasonable officer in Saylors' position could have believed that he was in immediate danger of being assaulted by someone suspected of committing a felony. He executed the takedown maneuver in direct response to a perceived threat of immediate physical harm by an uncooperative suspect. In light of the circumstances confronting him, Officer Saylors' actions were objectively reasonable. Even if Saylors were mistaken about Gessner's intentions, his use of force does not rise to the level of a Fourth Amendment violation. Accordingly, the

---

[5] After Gessner complained of injuries, Sergeant Eric Sheldon was dispatched to the scene. Gessner complained of a knee injury, which Sheldon described as "a small abrasion," requiring no medical attention. Doc. #37-3, PageID#177. Gessner also complained of wrist pain from the handcuffs. However, Sheldon observed no wrist injury, and noted that he could easily fit his finger between the handcuffs and Gessner's wrist. *Id.* Gessner complained of no other injuries on the night of the incident. *Id.* Nevertheless, he now alleges that the takedown maneuver caused a substantial shoulder injury that required surgery and months of physical therapy. He also claims to suffer from Post-Traumatic Stress Disorder as a result of the incident. As of yet, Gessner has produced no medical records to support these claimed injuries or to establish a causal connection between the alleged injuries and Officer Saylors' conduct.

Court finds that Officer Saylors is entitled to qualified immunity on Gessner's claim of use of excessive force.

For these reasons, the Court sustains Defendants' motion for summary judgment on Count I of the Amended Complaint.

### b. Count II: Arrest Without Probable Cause

In Count II of the Amended Complaint, Gessner alleges that Officers Saylors and Beane violated his Fourth and Fourteenth Amendment rights when they arrested him without probable cause. He alleges that, prior to placing him under arrest, "Defendants Saylors and Beane failed to take necessary steps to verify a likelihood or probability that [he] was one of the persons described by the caller." Doc. #19, PageID#110. The officers again argue that, based on the evidence presented, no reasonable jury could find that they lacked probable cause to arrest Gessner. They also argue that they are entitled to qualified immunity because, based on the facts alleged, there was probable cause for the arrest. Again, the Court agrees that there are no material facts in dispute that would defeat a claim of qualified immunity.

The Supreme Court has held that "'probable cause' to justify an arrest means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979). In their motion for summary judgment, Defendants maintain that they had probable cause

17

to arrest Gessner for any number of crimes, including theft, burglary, breaking and entering and/or trespass.

It is undisputed that Officers Saylors and Beane were dispatched to 417 Bantz Court on a call for breaking and entering. The caller, Kevin Whitenack, reported that, from his front porch on Bantz Court, he had observed two white men removing a furnace from a vacant house located at 417 Bantz Court. Doc. #37-1, PageID##169-70. Upon arriving at the scene, Officer Saylors spoke to Whitenack, who told him that the two suspects were inside 429 Bantz Court. *Id.* at PageID#170. Officer Beane walked over to 417 Bantz Court and verified that the door had been kicked in, and that copper piping, the furnace and other appliances appeared to have been removed from the house. Doc. #37-2, PageID#174.

The officers then knocked on the door of 429 Bantz Court and were invited inside. Mark Gessner and Christopher Miller were sitting in the living room, drinking beer. Doc. #37-1, PageID#170. These two white males matched the description of the suspects. Doc. #37-2, PageID#174. They were handcuffed and escorted to the police cruiser. On the way to the cruiser, Officer Saylors got Whitenack's attention, and pointed to Gessner's head to inquire whether Gessner was one of the individuals that Whitenack had observed carrying the furnace. Whitenack shook his head "yes." Doc. #37-1, PageID# 171. After Gessner and Miller were secured in the cruiser, Officer Saylors walked to Whitenack's house

and again verified that these were the two men he saw breaking into the vacant house. *Id.*

In support of his claim that he was arrested without probable cause, Gessner points to several inconsistencies in the record. According to the "Incident History Detail," the caller who reported the crime indicated that the suspects "live at" 429 Bantz Court. Doc. #41-3, PageID#210. Gessner, however, has never lived at that address. Doc. #41-2, PageID#199.

This discrepancy does not defeat a finding of probable cause. It is undisputed that Whitenack told the officers that the two suspects were presently inside 429 Bantz Court. It is also undisputed that, when the officers went to that address, they found Gessner and Miller sitting in the living room. Although Gessner maintains that Amy Leopard's father, John Leopard, was also at the house earlier in the evening, Doc. #41-2, PageID#197, there is no evidence that the officers saw John Leopard, or any other white male, at the house at the time of the arrest. Accordingly, it was reasonable for the officers to infer that Gessner and Miller were the two individuals that Whitenack had seen stealing the furnace.

Gessner maintains that he has never set foot on the property located at 417 Bantz Court. *Id.* at PageID#199. He denies stealing anything from that property.[6]

_____

[6] Gessner notes that the officers were never able to verify that a furnace was actually stolen from the vacant house. The owner of the vacant house verified that a stove, dishwasher and sink were missing. Doc. #41-2, PageID#204. However, "[b]ased on the Supplemental Report added by Officer Saylors, the furnace was not among items listed that were taken." *Id.* at PageID##208-09. It appears that the furnace was located in the basement and, because someone had

19

As Defendants note, however, the relevant question is not whether he actually committed the crime or crimes at issue, but rather whether the Defendants had probable cause to believe that he did. *See Criss v. City of Kent*, 867 F.2d 259, 262 (6th Cir. 1988) ("A valid arrest based upon then-existing probable cause is not vitiated if the suspect is later found innocent.").

According to Officer Beane, Gessner and Miller matched the description of the suspects. Doc. #37-2, PageID#174. The "Incident History Detail" indicates that, according to Whitenack, both suspects were white males. One had a black jacket; the clothing of the other was unknown. Doc. #41-3, PageID#210. After Beane arrived on the scene, he obtained a better description from Kevin Whitenack. Doc. #41-2, PageID#203.

Gessner notes that the "Incident History Detail," states "2 WM/s 30-45, 1-ball cap, red jacket." Doc. #41-3, PageID#210. However, it is not clear that Whitenack was the source of this information. Nor is it clear that the officers were privy to this information prior to the arrest. Christopher Miller admits that he was wearing a black jacket on the night of his arrest. Doc. #41-1, PageID#193. Gessner, however, was wearing a brown jacket that evening. *Id.* Miller states that Amy's Leopard's father, John Leopard, was wearing a red jacket and was present at 429 Bantz Court on the evening in question. Doc. #41-4,

---

screwed the basement door shut, the owner was unable to gain access to verify that the furnace was missing. *Id.* at PageID##204, 208-09.

PageID##194, 196.  However, as previously noted, there is no evidence that the officers saw John Leopard at the house when they arrested Miller and Gessner.

Admittedly, based on the facts alleged, the color of Gessner's jacket did not match the color of the jacket of the second suspect, as recorded in the "Incident History Detail."  "An eyewitness identification will constitute sufficient probable cause unless, at the time of the arrest, there is an apparent reason for the officer to believe that the eyewitness was lying, did not accurately describe what he had seen, or was in some fashion mistaken regarding his recollection."  *Ahlers v. Schebil*, 188 F.3d 365, 370 (6th Cir. 1999) (internal quotation omitted).  However, "officers, in the process of determining whether probable cause exists, cannot simply turn a blind eye toward potentially exculpatory evidence known to them in an effort to pin a crime on someone."  *Id.*

The fact that Gessner was wearing a brown jacket, and not a red one, at the time of his arrest, could be deemed potentially exculpatory.[7]  However, under the circumstances presented here, it does not negate a finding of probable cause. Gessner was present inside 429 Bantz Court, the address where Whitenack told the officers the suspects could be found.  Of far greater importance, after Gessner's arrest, Kevin Whitenack twice positively identified Gessner as one of the

---

[7]  Citing an audio recording of Officer Saylors' conversation with Karen Whitenack en route to the scene, Gessner claims that Whitenack told Saylors that one of the suspects was "tall and skinny."  Doc. #41, PageID#188.  Gessner maintains that, at 5'11" and 190 pounds, Doc. #41-4, PageID#211, he does not fit that description.  Nevertheless, as noted earlier, the audio recording is not part of the record and may not be considered.  Gessner has presented no admissible evidence of the contents of the conversation between Saylors and Whitenack.

two suspects he had observed stealing the furnace from the vacant house—once as Officer Saylors was escorting Gessner to the cruiser, and again after Gessner was secured in the cruiser. There is little reason to believe that Whitenack's eyewitness identification was in any way "untruthful or unreliable." *Ahlers*, 188 F.3d at 371. *See also Legenzoff v. Steckel*, 564 F. App'x 136, 142 (6th Cir. 2014) ("an eye witness identification and accusation, by itself, is sufficient to establish probable cause.").

Gessner suggests that Whitenack's view from his front porch would have been obstructed, rendering it impossible for him to confirm that Gessner was one of the men he had reported. In support, Gessner submits a picture of the front porch of 429 Bantz Court. Doc. #41-6, PageID#213. The picture appears to have been taken from the street. Nevertheless, because it is not clear where Whitenack's house is located in relation to this picture, the picture is not at all helpful in determining whether Whitenack had a clear view of what was happening.

Viewing the evidence of record in the light most favorable to Gessner, the facts and circumstances within the officers' knowledge were sufficient to justify a reasonable belief that Gessner had committed a crime. *Michigan v. DeFillippo*, 443 U.S. at 37. Because probable cause existed for the arrest, the officers did not violate Gessner's Fourth Amendment rights. They are, therefore, entitled to qualified immunity on this claim. Summary judgment will be entered in favor of Defendants on this basis.

### B.    State Law Claims

Gessner has also asserted state law claims of intentional and negligent infliction of emotional distress against the officers, based on the same facts giving rise to the § 1983 claims.

#### 1.    Intentional Infliction of Emotional Distress

Defendants argue that Gessner's intentional infliction of emotional distress claim is subject to a one-year statute of limitations, because it arose out of what would have been a state tort claim for assault and battery.  *See Smith v. Montgomery Cty. Sheriff's Office*, No. 3:10-cv-448, 2012 WL 4792398, at *14 (S.D. Ohio Oct. 9, 2012).  Because the incident took place on March 30, 2013, and Gessner did not file suit until March 31, 2015, this claim is therefore time-barred.  Defendants also argue that the factual allegations in the Amended Complaint are insufficient to state a plausible claim for intentional infliction of emotional distress.  Gessner has not responded to either of these arguments.  The Court finds that, for the reasons advanced by Defendants, summary judgment on this claim is warranted.

#### 2.    Negligent Infliction of Emotional Distress

Defendants also seek summary judgment on Gessner's claim of negligent infliction of emotional distress.  Such claims may be brought only by bystanders, not by actual victims.  *See Schultz v. Barberton Glass Co.*, 4 Ohio St. 3d 131, 447 N.E. 2d 109 (1983).  Moreover, under Ohio Revised Code § 2744.03(A)(6), the officers are immune from tort claims arising out of negligence.

Again, Gessner has failed to respond to either of these arguments, impliedly conceding their merit. The Court agrees that, under Ohio law, Gessner cannot recover on a claim of negligent infliction of emotional distress. Summary judgment is therefore warranted on this claim also.

## IV.  Conclusion

For the reasons set forth above, the Court SUSTAINS Defendants' Motion for Summary Judgment, Doc. #37, on all claims. Judgment shall be entered in favor of Defendants and against Plaintiff.

The captioned case is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.

Date: June 5, 2018

WALTER H. RICE
UNITED STATES DISTRICT JUDGE